MAURICE M. GOLDMAN, executor, & another *vs.*
BARRY KANE & another.

Barnstable.    April 16, 1975. — June 13, 1975.

Present: HALE, C.J., ROSE, & ARMSTRONG, JJ.

*Attorney at Law.    Fiduciary.    Equity Pleading and Practice,* Appeal.

Evidence that an attorney, who had represented a client on a number of legal matters over a period of years, advised the client regarding the purchase of a large boat, negotiations for its transfer, the registration thereof, and nautical requirements of the vessel, and, after unsuccessfully attempting to arrange financing for the purchase, agreed to loan the client money through a corporation in which the attorney owned 95% of the stock, warranted a conclusion that at the time of the loan transaction an attorney-client relationship existed. [340]

An attorney who made a loan to a client, the terms of which were fundamentally unfair to the client and which resulted in a substan-

tial benefit to the attorney at the client's expense, breached his fiduciary duty to the client in proceeding with the loan when the client had not obtained independent advice on the matter, even though the attorney himself advised against the transaction. [340-342]

BILL IN EQUITY filed in the Probate Court for the county of Barnstable on February 14, 1972.

The case was heard by *McLellan*, J.

*Robert W. MacDonald* for the defendants.

*Maurice Goldman* for the plaintiffs.

HALE, C.J.    The defendants, Barry Kane and Higley Hill, Inc., appeal from a judgment of a Probate Court ordering them to pay $50,806, plus interest, to the plaintiff Goldman, as the executor of the estate of Lawrence E. Hill.[1] We have before us the trial judge's findings and rulings, along with various exhibits. The transcript of the evidence is not before us. A summary of the pertinent facts found by the judge follows.

Lawrence Hill, a fifty-three year old law school graduate, and his wife moved to Cape Cod in October, 1967. At that time Hill was the income beneficiary of two trusts. He received weekly income from one trust of about $200, and from the other he received approximately $30,000 a year, which was divided into two semi-annual payments. In 1968 Hill was introduced to Barry Kane, a practicing attorney with offices in Chatham and Yarmouth, after Hill had decided to purchase a parcel of real estate in Chatham (Kent Road property). As Hill's attorney, Kane set up a corporation, Lawrence Properties, Inc. (the other plaintiff in this suit and of which Hill owned all the outstanding shares), drew up a purchase and sale agreement for the Kent Road property whereby title to the parcel was to be taken by Lawrence Properties, Inc., and arranged for and obtained a mortgage loan on Hill's behalf. Between 1968 and 1970 Kane acted as Hill's attorney on a number of matters, including matters arising from the death of Hill's

---

[1] Hill (who initiated this suit) died on January 14, 1974, and the executor of his estate was substituted.

wife. During that period he received fees for legal services performed by him. It also appears that at various times throughout their relationship Hill paid money to Kane, who in turn paid Hill's bills.

In October, 1970, Hill decided to "change his lifestyle and live aboard a boat"; whereupon he left for Florida in the "Alas II," a twenty-two foot sloop which he owned. At about this time, Hill decided that he needed a larger vessel. While he was in the process of looking for an appropriate vessel to buy, Hill continuously sought advice from Kane both by telephone and letter. On April 17, 1971, Hill signed an agreement to purchase a forty-three foot ketch called the "Sea Chase" for $31,500, towards which he paid a deposit of $3,150, agreeing to pay the balance on or before May 17, 1971. Prior to Hill's signing the agreement Kane advised him on matters such as negotiations for the transfer of the "Sea Chase," the registration thereof, and technical nautical requirements of the vessel. Hill also asked Kane to arrange for the financing of the balance of $28,350 which would have to be paid by May 17.

In early May, 1971, Kane informed Hill that he was unable to arrange a loan with a bank, whereupon Hill instructed Kane to sell the Kent Road property. That property was put on the market at an offering price of $85,000, but Kane was unable to effect a sale. On May 30, Hill telephoned Kane on two or three occasions and told him he was in dire need of the money because he stood to lose the .$3,150 deposit if he should be unable to raise the balance of the purchase price of the "Sea Chase" by the next day. In one of those conversations Kane told Hill that "it was virtually impossible" to get a loan in view of Hill's financial predicament and in view of the time limitation. In a subsequent conversation Kane told Hill that Kane's corporation[2] would loan him $30,000 but that, in consideration of making the loan, Hill would have to convey to the

---

[2] Kane's corporation is the defendant, Higley Hill, Inc., of which Kane owned ninety-five per cent of the outstanding stock.

corporation absolute title to (1) the Kent Road property, (2) all of the personal property located therein, and (3) the "Alas II." In addition, Hill and Lawrence Properties, Inc. would have to execute a note to Kane's corporation for the repayment of the $30,000, and to secure the performance of the note, Hill would have to convey to Kane's corporation title to the "Sea Chase," which would be reconveyed upon full repayment of the note. After Hill agreed to the terms of the loan, Kane obtained the $30,000, prepared some of the necessary documents, and left for Florida, arriving there shortly after midnight on June 2. During that day he advised Hill not to enter into the agreement and to "walk away" from his deposit (see n. 3). However, Hill insisted on going forward, and the transaction was consummated on June 2, when Hill signed the following documents prepared by Kane: (1) a quitclaim deed transferring the title of the Kent Road property from Lawrence Properties, Inc. to Kane's corporation, subject to two outstanding mortgages; (2) a bill of sale transferring the "Alas II" from Hill to Kane's corporation; (3) a bill of sale transferring all of the personal property located in the Kent Road property from Lawrence Properties, Inc. to Kane's corporation; and (4) a non-interest bearing note for $30,000 requiring payment in two installments of $15,000 each on September 15, 1971, and March 1, 1972. Hill also signed an agreement, prepared by Kane, which recited the terms of the loan and which indicated that Hill was aware of the drawbacks of the agreement and that Kane had advised him against entering into it.[3] Shortly thereafter, by arrangement of the parties, title to the "Sea Chase" was taken in the name of Kane's corporation.

---

[3] The agreement stated in part: "I fully understand that Barry Kane, Esq., my attorney, is a major stockholder of Higley Hill, Inc., the transferee named herein. As my attorney, he has strongly advised me that this transfer is adverse to my financial welfare and has recommended that I not make said transfer. My only expectations from this said transfer are that I shall receive legal title to the aforesaid Bluenose ketch upon having completed repayment of the $30,000 loan to Higley Hill, Inc., in accordance with the terms of the note."

In July, 1971, Kane's corporation sold the Kent Road
property with furnishings for $86,000. In September, 1971,
Hill defaulted on the first payment of the $30,000 note,
whereupon Kane, without notice to Hill, took possession
of the "Sea Chase."

The judge concluded that at the time of the transaction
the relationship of attorney and client existed between
Kane and Hill and that Kane breached his fiduciary obli-
gations to Hill by taking unfair advantage of that relation-
ship. As a result the judge ordered that the defendants pay
to Hill's executor $50,806, plus interest.[4]

The defendants contend that the judge erred in conclud-
ing that an attorney-client relationship existed between
Kane and Hill at the time of the transaction. This conten-
tion is without merit, as the judge's subsidiary findings
amply support his conclusion. See *Hill* v. *Hall,* 191 Mass.
253, 266 (1906).

The defendants argue that even if an attorney-client
relationship existed the record does not support the con-
clusion that there was a breach of that relationship. We
disagree. The relationship of attorney and client is highly
fiduciary in nature. *Hill* v. *Hall, supra,* at 262-263. *Berman*
v. *Coakley,* 243 Mass. 348, 355 (1923). *Tarr* v. *Vivian,* 272
Mass. 150, 153 (1930). *Allen* v. *Moushegian,* 320 Mass.
746, 757 (1947). *Hendrickson* v. *Sears,* 365 Mass. 83, 90
(1974). "Unflinching fidelity to their genuine interests is
the duty of every attorney to his clients. Public policy
hardly can touch matters of more general concern than the
maintenance of an untarnished standard of conduct by the

---

[4] This figure was apparently reached as a result of the judge's find-
ings that the values of the assets transferred from Hill to Kane or his
corporation in consideration for the making of the loan were as fol-
lows: 1. Hill's equity in the Kent Road property — $42,000; 2. The
"Alas II" — $7,000; 3. Furniture from the Kent Road property which
was retained by Kane — $1,000. The $806 concerned a different matter
which is not argued by the parties. The judge found that the fair mar-
ket value of "Sea Chase" was $30,000 (which amount was offset by
the loan) and that any additional money paid by Hill was offset by
reason of his use and enjoyment of the vessel.

attorney at law toward his client." *Berman* v. *Coakley,* *supra,* at 354.

The law looks with great disfavor upon an attorney who has business dealings with his client which result in gains to the attorney at the expense of the client. "The attorney is not permitted by the law to take any advantage of his client. The principles holding the attorney to a conspicuous degree of faithfulness and forbidding him to take personal advantage of his client are thoroughly established." *Berman* v. *Coakley, supra,* at 355. *Tarr* v. *Vivian, supra,* at 153. *Dunne* v. *Cunningham,* 234 Mass. 332, 335 (1920). *Ruczinski* v. *Russ,* 337 Mass. 514, 516 (1958). See Canon DR 5-104 of the A.B.A. Code of Professional Responsibility (1970) (see now Rule 3:22 of the Supreme Judicial Court, effective October 2, 1972, 359 Mass. 796, 815-816 [1972]). When an attorney bargains with his client in a business transaction in a manner which is advantageous to himself, and if that transaction is later called into question, the court will subject it to close scrutiny. In such a case, the attorney has the burden of showing that the transaction "was in all respects fairly and equitably conducted; that he fully and faithfully discharged all his duties to his client, not only by refraining from any misrepresentation or concealment of any material fact, but by active diligence to see that his client was fully informed of the nature and effect of the transaction proposed and of his own rights and interests in the subject matter involved, and by seeing to it that his client either has independent advice in the matter or else receives from the attorney such advice as the latter would have been expected to give had the transaction been one between his client and a stranger." *Hill* v. *Hall,* 191 Mass. 253, 262 (1906). *Webster* v. *Kelly,* 274 Mass. 564, 571 (1931). *Israel* v. *Sommer,* 292 Mass. 113, 122 (1935).

Applying these principles to the case at bar, it is clear that the judge was correct in concluding that Kane, by entering into the transaction, breached his fiduciary duty to Hill. While the defendants contend that Kane's conduct did not constitute a breach of his fiduciary duty because Hill fully understood the nature and effect of the transac-

tion and because Kane advised Hill against it[5], in the circumstances of this case, Kane's full disclosure and his advice were not sufficient to immunize him from liability. Contrast *Manheim* v. *Woods,* 213 Mass. 537, 544 (1913); *Mitchell* v. *Wright,* 234 Mass. 458, 465-466 (1920). The fundamental unfairness of the transaction and the egregious overreaching by Kane in his dealings with Hill are self-evident. See *Israel* v. *Sommer, supra.* Contrast *Ruczinski* v. *Russ,* 337 Mass. 514, 516 (1958). In light of the nature of the transaction, Kane, at a bare minimum, was under a duty not to proceed with the loan until he was satisfied that Hill had obtained independent advice on the matter. See *Hill* v. *Hall,* 191 Mass. 253, 262 (1906). *Webster* v. *Kelly,* 274 Mass. 564, 571 (1931). *Israel* v. *Sommer,* 292 Mass. 113, 123, 124 (1935). *Reilly v. McAuliffe,* 331 Mass. 144, 149 (1954). The purpose of such requirement is to be certain that in a situation where an attorney deals with a client in a business relationship to the attorney's advantage, the "presumed influence resulting from the relationship has been neutralized." *Israel* v. *Sommer, supra,* at 123.

The plaintiffs argue that this court should revise the judgment of the Probate Court so as to include an order that the "Sea Chase" and Hill's $3,150 deposit be returned to the executor of Hill's estate on the ground that the loan agreement was usurious. However, that issue is not properly before us, as the plaintiffs' appeal was untimely and was dismissed on the plaintiffs' own motion prior to oral argument. See *C. J. Hogan, Inc.* v. *Atlantic Corp.* 332 Mass. 322, 327-328 (1955).

*Judgment affirmed.*

---

[5] It is important to note that after Hill agreed to the loan arrangement on the telephone and prior to any negative advice given by Kane, Kane prepared some of the documents necessary to consummate the agreement. Two days later Kane went to Florida where he advised Hill not to go through with the loan. However, this advice was given only a short time before the transaction was consummated.